CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 1 2 2007

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JEAN MILLS, Personal Representative of the Estate of Connie Mills, | )<br>)<br>) Civil Action No. 7:07CV00220<br>) |
| Plaintiff, | ) **MEMORANDUM OPINION**<br>) |
| v. | ) By: Hon. Glen E. Conrad<br>) United States District Judge |
| CITY OF ROANOKE, et al., | )<br>) |
| Defendants. | ) |

Jean Mills, the Personal Representative of the Estate of Connie Mills, filed this civil rights action against the City of Roanoke and two officers with the Roanoke City Police Department ("RCPD"), Tracy Huff and Bobby Harman. The case is presently before the court on the defendants' motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the court will grant the defendants' motion.

## Background

The following facts, which are taken from the plaintiff's complaint, are accepted as true for purposes of the defendants' motion to dismiss. See Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 217-218 (4th Cir. 1994).

On July 29, 2005, Michael Holmes, a convicted felon, shot and killed Connie Mills at her home in the City of Roanoke. Approximately two months prior to this incident, Tracy Huff, while on duty as an officer with the RCPD, observed Holmes sleeping in an automobile while holding a firearm wrapped in a shirt. Holmes initially fled from Huff, but later turned himself in to the RCPD.[1]

---

[1] Under Virginia law, possessing a firearm after having been convicted of a felony is a Class 6 felony, which is punishable by a maximum term of imprisonment of five years. See Va. Code §§ 18.2-

The plaintiff alleges that at all times relevant to the instant complaint, the RCPD maintained and enforced a policy of not arresting or charging felons found in possession of a firearm. Instead, the RCPD referred such cases to federal authorities for prosecution.[2] The plaintiff alleges that, pursuant to this policy, Bobby Harman directed Huff not to arrest or charge Holmes with being a felon in possession of a firearm. Thus, from the date that Huff observed Holmes in possession of a firearm through July 29, 2005, the date that Connie Mills was shot and killed, the defendants did not arrest or charge Holmes.

The plaintiff alleges that had the RCPD arrested, obtained a warrant for, or sought an indictment for Holmes, he would have been arrested and either incarcerated or placed on pretrial monitoring as of July 29, 2005. The plaintiff further alleges that as a direct and proximate result of the RCPD policy and the actions of the defendants, Holmes remained free and without legal restraint, and thereafter shot and killed Connie Mills. Additionally, the plaintiff alleges that the risk of harm was reasonably foreseeable to the defendants.

The plaintiff, Connie Mills' mother, filed this action against the defendants on April 26, 2007. In Count I, the plaintiff asserts a substantive due process claim against the defendants. In Count II, the plaintiff asserts an equal protection claim against the defendants. In Count III, the plaintiff asserts a state law claim for nonfeasance against the City of Roanoke.

---

308.2 and 18.2-10.

[2] Under federal law, possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g), is a felony punishable by a maximum term of imprisonment of ten years. See 18 U.S.C. § 924(a)(2).

## Discussion

The defendants have moved to dismiss the plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint"; such motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999) (internal citations omitted). When reviewing a claim pursuant to Rule 12(b)(6), the court must accept all of the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Id. at 244.

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-1965 (2007). Instead, assuming the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." Id.

### I. Substantive Due Process Claim

The plaintiff first asserts that the defendants violated Connie Mills' "substantive due process right to life" under the Fourteenth Amendment. (Compl. at 5.) To support her substantive due process claim, the plaintiff alleges that the defendants had a duty to enforce the laws, preserve the peace, and protect the citizens of the City of Roanoke, and that a foreseeable consequence of the defendants' decision not to arrest or charge Holmes was that he would use a firearm to commit additional criminal acts. The plaintiff further alleges that had the defendants arrested or charged Holmes, Mills would not have been killed.

3

In moving to dismiss the plaintiff's substantive due process claim, the defendants argue that the claim is foreclosed by the United States Supreme Court's decisions in DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 (1989) and Town of Castle Rock v. Gonzales, 545 U.S. 748 (2005).

In DeShaney, the petitioner was a child who was beaten and permanently injured by his father, with whom the child lived. DeShaney, 489 U.S. at 191. The respondents were social workers and other local officials who received complaints that the child was being abused by his father, but did not act to remove the child from his father's custody. Id. The petitioner filed suit against the respondents, alleging that their failure to act deprived him of his liberty in violation of the Due Process Clause of the Fourteenth Amendment. Id. The Supreme Court disagreed, holding "[a]s a general matter," that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197. In reaching this decision, the Supreme Court emphasized that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Id. at 195. "Its purpose was to protect people from the State, not to ensure that the State protected them from each other." Id.

Approximately twenty-five years later, the Supreme Court decided the case of Town of Castle Rock, which involved a procedural due process claim arising from the murder of three children by their father. Town of Castle Rock, 545 U.S. at 754. The Supreme Court was faced with the question of "whether an individual who has obtained a state-law restraining order has a constitutionally protected property interest in having the police enforce the restraining order when they have probable cause to believe that it has been violated." Id. at 750. In attempting to

4

answer this question, the Court examined whether Colorado law gave the respondent, the children's mother, a right to enforcement of a restraining order that had been issued at her request, and ultimately determined that Colorado law did not make enforcement of restraining orders mandatory. Id. at 758-760. The Court went on to explain that even if Colorado law gave the respondent an entitlement to the enforcement of the restraining order, it would not necessarily mean that such entitlement constituted a property interest for purposes of the Due Process Clause. Id. at 766. The Court ultimately held that the indirect nature of the benefit conferred on the respondent as a result of the restraining order was insufficient to give rise to a protected property interest. Id. In its conclusion, the Court emphasized that "[i]n light of today's decision and that in DeShaney, the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protection under the Due Process Clause, neither in its procedural nor its 'substantive' manifestations." Id. at 768.

In response to the defendants' motion to dismiss, the plaintiff argues that her substantive due process claim is cognizable under an exception to DeShaney's general rule. In DeShaney, the Supreme Court noted that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." DeShaney, 489 U.S. at 201. Relying on this passage, circuit courts have acknowledged that there may be possible constitutional liability when the state creates a dangerous situation or renders individuals more vulnerable to danger. Butera v. District of Columbia, 235 F.3d 637, 649 (D.C. Cir. 2001) (citing decisions from every circuit).

5

It is this state-created danger exception that the plaintiff relies on in this case.[3] The plaintiff contends that the defendants created the danger by not arresting or charging Holmes. However, the state-created danger exception does not apply when officials merely fail to act. As the United States Court of Appeals for the District of Columbia Circuit explained in Butera:

> [T]he circuits have held that a key requirement for constitutional liability is affirmative conduct by the State to increase or create the danger that results in harm to the individual. No constitutional liability exists where the State actors had no hand in creating the danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role for them. Absent such affirmative conduct by the State to endanger an individual, courts have rejected liability under a State endangerment concept.

Butera, 235 F.3d at 650 (internal citations omitted). Stated differently, "the issue is whether the officers did anything affirmative to embolden the person causing harm to another." Brooks v. Knapp, 221 Fed. Appx. 402, 407 (6th Cir. 2007). "Failure to act, as opposed to affirmative conduct, does not cause a state-created danger to arise." Id.

This distinction between an official's failure to act, as opposed to affirmative conduct, has been expressly relied upon by the United States Court of Appeals for the Fourth Circuit. The leading Fourth Circuit case on the state-created danger exception is Pinder v. Johnson, 54 F.3d 1169 (4th Cir. 1995). In Pinder, the Court was "was faced with a case in which it had to decide the contours of DeShaney's state-created danger exception." Stevenson v. Martin County Bd. of Educ., 3 Fed. Appx. 25, 31 (4th Cir. 2001). Carol Pinder's ex-boyfriend, Don Pittman, broke into her home, pushed her, punched her, and threatened to kill her and her children. Pinder, 54 F.3d at 1171. Pinder called the police, and when an officer arrived, she told him about Pittman's

---

[3] The plaintiff expressly indicates in her response to the defendants' motion to dismiss that she is not relying on the second recognized DeShaney exception, which applies when the state has created a special relationship with an individual. See Pinder v. Johnson, 54 F.3d 1169, 1174-1175 (4th Cir. 1995).

6

abusive actions and threats. Id. The officer arrested Pittman, who was hostile and unresponsive. Id. When Pinder expressed concern over the safety of herself and her children, and asked whether it would be safe for her to return to work, the officer assured Pinder that Pittman would be locked up overnight. Id. However, the officer ultimately charged Pittman with only misdemeanor offenses, and he was released on his own recognizance. Id. While Pinder was at work, Pittman set fire to her house, killing her three sleeping children. Id. Pinder filed a § 1983 action against the officer, claiming, in part, that the officer created the danger. Id. at 1175. The Fourth Circuit ultimately rejected Pinder's reliance on the state-created danger exception, and held that, "[a]s was true in DeShaney, the state did not 'create' the danger, it simply failed to provide adequate protection from it." Id. The Court emphasized that "[i]n both cases, 'the most that can be said of the state functionaries . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.'" Id. (quoting DeShaney, 489 U.S. at 203); see also Stevenson, 3 Fed. Appx. at 31 ("In order to create a danger, the state has to take some affirmative steps. Liability does not arise when the state stands by and does nothing in the face of danger.").

Based on the Fourth Circuit's decision in Pinder, the court concludes that the plaintiff in this case has failed to state a substantive due process claim against the defendants on the basis of the state-created danger exception. While the plaintiff alleges that the defendants created the danger by affirmatively deciding not to arrest Holmes, it is clear that the defendants took no affirmative action. Instead, the defendants failed to act. Such an "omission claim" fails as a matter of law under Pinder.

7

Notwithstanding the Fourth Circuit's application of the state-created danger exception in Pinder, the plaintiff argues that her substantive due process claim is viable in light of decisions rendered by other circuits. However, each of the three cases on which the plaintiff relies, Reed v. Gardner, 986 F.2d 1122 (7th Cir. 1993), Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989), and Nishiyama v. Dickson County, 814 F.2d 277 (6th Cir. 1987), is factually distinguishable.

In Reed v. Gardner, the Reed family suffered a tragic accident when a drunk driver crossed the center line of the highway and crashed into the family's vehicle. Reed, 986 F.2d at 1123. Earlier that day, three police officers had arrested the original driver of the car, leaving an intoxicated passenger behind. Id. The passenger became the drunk driver who caused the collision approximately two hours later. Id. The Reed family filed a § 1983 action in which they alleged, in part, that the three police officers violated their constitutional rights by creating a dangerous situation and failing to protect them from it. Id. at 1125. In dismissing the claim under Rule 12(b)(6), the district court held that the police officers did not create the dangerous situation because the original driver herself was arrested for driving while intoxicated. Id. at 1124. However, the United States Court of Appeals for the Seventh Circuit reversed the district court's decision, emphasizing that the pleadings contained no allegation that the original driver was intoxicated when the officers arrested her, and that the district court erred by relying on information contained in one of the defendants' motions to dismiss. Id.

Considering the plaintiffs' allegations in light of DeShaney, the Seventh Circuit distinguished the case from those in which state actors merely "stood by and did nothing when suspicious circumstances dictated a more active role for them," and held that "[p]olice officers

8

who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable." Id. at 1125 (internal citations omitted). The Court emphasized that it was the affirmative act of removing the original passenger, combined with the officers' knowledge of the passenger's intoxication, which subjected them to potential liability, and that if the officers "had failed to arrest [the original driver], "they would have had no liability if she had exchanged places with [the passenger] and he had driven headlong into the Reeds' car." Id. (emphasis added). Likewise, the Court noted that the plaintiffs' faced an "insurmountable hurdle on summary judgment," given the potential evidence of the original driver's intoxication, since "police officers are not subject to liability under section 1983 for exchanging one drunk driver for another." Id. As the Court explained, "[t]he reason is simple: without state intervention, the same danger would exist." Id.

Affirmative conduct on the part of municipal officials was also present in the case of Cornelius v. Town of Highland Lake, which was decided shortly after DeShaney by the United States Court of Appeals for the Eleventh Circuit. In Cornelius, the plaintiff, who served as Town Clerk, was kidnapped and terrorized by two prison inmates, while they were assigned to a community work squad program in Highland Lake. Cornelius, 880 F.2d at 349-350. The plaintiff filed a § 1983 action against the Town, several municipal officials, and various members of the Alabama Department of Corrections, alleging that they violated her constitutionally protected liberty interests. Id. at 349. Evaluating the facts in light of DeShaney's state-created danger exception, the Court held that the municipal officials "did indeed create the dangerous situation of the inmates' presence in the community by establishing the work squad and assigning the inmates to work around the town hall." Id. at 356. Additionally, "the defendants increased

9

Mrs. Cornelius's vulnerability to harm by regularly exposing her to the work squad inmates by virtue of her position of Town Clerk." Id. Such affirmative actions, coupled with the degree of control that the municipal officials exercised over the plaintiff as Town Clerk, led the Court to conclude that there was a genuine issue of material fact as to whether the officials violated the plaintiff's due process rights. Id.

Finally, Nishiyama v. Dickson County involved egregious affirmative conduct on the part of the defendants. In Nishiyama, which was decided by the United States Court of Appeals for the Sixth Circuit before DeShaney, the plaintiff alleged that the Dickson County Sheriff's "policy and practice of entrusting fully-equipped patrol cars to inmate Charles Hartman, a convicted felon, deprived their daughter of her life without due process of law." Nishiyama, 814 F.2d at 278. The Sheriff and his deputy allegedly permitted Hartman to operate a patrol car, while he was incarcerated, even though they were aware that Hartman had assaulted a young woman in the past. Id. at 279. On the night that Kathy Nishiyama was murdered, Harman had full, unsupervised possession of a patrol car, after he transported the deputy to the deputy's home. Id. Hartman then began roaming the highways in three counties and stopped several motorists by flashing the car's blue lights. Id. When officials in one county learned that an inmate was stopping motorists, they contacted the Dickson County dispatcher, who, in turn, notified the Sheriff and his deputy. Id. Both officials did nothing, and in the interim, Hartman pulled over Kathy Nishiyama and killed her. Id. Based on these allegations, the Sixth Circuit held that the plaintiffs "established a claim that the defendants' conduct under color of state law deprived Kathy Nishiyama of a constitutionally-protected interest in life." Id. at 281. In reaching this decision, the Court emphasized that "the death of Kathy Nishiyama cannot be viewed as so

10

remote a consequence of the defendants' actions as to automatically preclude liability under section 1983. Through their established practice of entrusting the police car to Hartman, [the defendants] set in motion the specific forces that allowed him to commit his crime." Id.

The affirmative acts on the part of the defendants in Reed, Cornelius, and Nishiyama are clearly distinguishable from the plaintiff's allegations in this case. As previously stated, the plaintiff's substantive due process claim is based on the defendants' failure to arrest or charge Holmes. Such a "[f]ailure to act, as opposed to affirmative conduct, does not cause a 'state-created danger' to arise." Brooks, 221 Fed. Appx. at 407. Instead, "[the defendants] must have done something affirmative to increase the harm beyond that of which they were already cognizant." Id. Given the absence of any allegations of such affirmative conduct on the part of the defendants, the plaintiff's substantive due process claim must be dismissed.

## II. Equal Protection Claim

The plaintiff next asserts an equal protection claim against the defendants. To support this claim, the plaintiff alleges, in part, as follows:

> [T]he RCPD's policy and its application are at odds with the laws of the Commonwealth of Virginia, and therefore, the RCPD subjects and continues to subject persons within the City of Roanoke, including Connie Mills, to dissimilar treatment from persons located elsewhere in the Commonwealth of Virginia, who are not subjected to the risk of convicted felons in possession of firearms being free and without legal restraint to further commit criminal acts.
>
> The RCPD policy deprives all persons within the City of Roanoke, of which Mills was a member, of the equal protection of the laws and their constitutional right to be availed of the equal protection of the laws.

(Compl. at 7.)

11

In moving to dismiss this claim, the defendants argue that the plaintiff's allegations are legally insufficient, in that the defendants can only exercise control and discretion over law enforcement policies within the City of Roanoke, and that the plaintiff's allegations confirm that the defendants have treated all individuals within the jurisdiction of the City of Roanoke equally. As the defendants point out, the Equal Protection Clause of the Fourteenth Amendment states that no state shall "deny to any person *within its jurisdiction* the equal protection of the laws." U.S. Const. amend. XIV. § 1 (emphasis added). To state an equal protection claim, the plaintiff must allege facts which show that the defendants treated Connie Mills differently from others with whom she was similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Veney v. Wyche, 293 F.3d 726, 730-731 (4th Cir. 2002).

Although the plaintiff argues that citizens of the City of Roanoke are treated differently than citizens of other localities as a result of the RCPD policy, the Supreme Court has held that the Equal Protection Clause "relates to equality between persons as such, rather than between areas and . . . territorial uniformity is not a constitutional prerequisite." McGowan v. Maryland, 366 U.S. 420, 427 (1961). As long as all individuals within the jurisdictional reach of a policy are equally affected by the policy, it does not matter that those in a different jurisdiction are not subjected to the same policy. As the Supreme Court explained in Salzburg v. Maryland, 346 U.S. 545 (1954):

> There is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent it from doing so. This would not, of itself, within the meaning of the Fourteenth

>  Amendment, be a denial to any person of the equal protection of
>  the laws . . . . It means that no person or class of persons shall be
>  denied the same protection of the laws which is enjoyed by other
>  persons or other classes *in the same place* and under like
>  circumstances.

Salzburg, 346 U.S. at 551 (internal citations omitted) (emphasis added).

In this case, the plaintiff alleges that "all persons within the City of Roanoke," of which Connie Mills was a citizen, were affected by the RCPD's policy of not arresting or charging felons found in possession of a firearm and instead referring such cases to federal authorities for prosecution. Because the plaintiff does not allege that Connie Mills was treated any differently from anyone within the jurisdictional reach of the RCPD policy, she has failed to state a viable equal protection claim. See Rodgers v. Johnson, 174 Fed. Appx. 3, 4 (3rd Cir. 2006) (holding that the plaintiff's equal protection claim was without merit, where the plaintiff challenged Philadelphia's requirement that persons seeking to renew their gun permits must submit to fingerprinting, since all persons within Philadelphia were subject to the same requirement, and the plaintiff did not contend that he was treated differently from other similarly situated persons within Philadelphia); Slade v. Hampton Roads Regional Jail, 303 F. Supp. 2d 779, 782-783 (E.D. Va. 2004) (holding that the jail does not violate the Equal Protection Clause by charging its inmates a daily fee, as permitted by Virginia Code § 53.1-131.3, even if other local jails choose not to exercise such authority, "as long as that facility applies the statute equally to all pretrial inmates under its supervision . . . .").

### III.  Nonfeasance Claim

The plaintiff's final claim is one for nonfeasance under Virginia law against the City of

13

Roanoke. To support this claim, the plaintiff alleges that the RCPD is charged with enforcing the laws of the Commonwealth of Virginia and protecting the citizens of the City of Roanoke; that the RCPD's failure to enforce the laws constitutes nonfeasance by the City of Roanoke; and that the City's nonfeasance resulted in Connie Mills' death. For the following reasons, the court concludes that this claim is also subject to dismissal.

Generally, an individual or entity has no duty under Virginia law to control the conduct of third persons in order to prevent physical harm to another. Marshall v. Winston, 239 Va. 315, 318 (Va. 1990). "This is especially the case when the third person commits acts of assaultive behavior because such conduct cannot reasonably be foreseen." Id. This "general rule applies unless '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct; or (b) a special relation exits between the actor and the other which gives to the other a right to protection.'" Id. (quoting Restatement (Second) of Torts § 315). The special relationship referenced in § 315(a) is detailed in § 319 of the Restatement (Second) of Torts. Id. "Section 319 provides that '[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Id. The Supreme Court of Virginia has held that no special relationship exists between a public official and a claimant, for purposes of § 315(b), where the claimant is merely a member of the general public to whom no distinguishable, special duty is owed. Id. at 319; see also Burdette v. Marks, 244 Va. 309, 312 (Va. 1992) ("A public official cannot be held civilly liable for violating a duty owed to the public at large because it is not in society's best interest to subject public officials to potential liability for every action undertaken.").

14

Applying these principles, the court concludes that the plaintiff has failed to state a claim for nonfeasance against the City of Roanoke. No special relationship existed between the City and Holmes, pursuant to §§ 315(a) and 319 of the Restatement (Second) of Torts, since the RCPD did not take custody of or exercise control over Holmes. Compare Fox v. Custis, 236 Va. 69, 75 (Va. 1988) (holding that a parolee, who had been released from incarceration, was not in the custody of his parole officers for purposes of § 319) with Dudley v. Offender Aid and Restoration of Richmond, Inc., 241 Va. 270, 276 (Va. 1991) (holding that a felon placed in a halfway house for the remainder of his sentence was in the custody of the halfway house for purposes of § 319). Additionally, the plaintiff has failed to allege facts which, if proven, would establish that Connie Mills "was an identifiable person, or a member of an identifiable class of persons, to whom the defendants owed a duty distinguishable from the duty they owed to the citizenry at large." Marshall, 239 Va. at 320.

To support her claim for nonfeasance, the plaintiff relies primarily on the Supreme Court of Virginia's decision in Dudley v. Offender Aid and Restoration of Richmond, Inc.. However, the facts of Dudley are clearly distinguishable from the allegations in the instant case. In Dudley, a convicted felon with a lengthy criminal record, Timothy Spencer, was permitted to serve a portion of his sentence at a halfway house owned and operated by Offender Aid and Restoration of Richmond, Inc. ("OAR"). Dudley, 241 Va. at 272-273. The motion for judgment alleged that the halfway house was ill-kept, and that residents were essentially unsupervised, with security measures being practically nonexistent. Id. at 274. On the evening of September 19, 1987, Spencer allegedly left the halfway house, broke into Debbie Davis' apartment, raped and murdered her, and returned around 12:30 a.m. Id. Although Spencer was unaccounted for

15

during the evening head count, OAR personnel made no inquiry into his activities. Id. Spencer's absence from the halfway house without authorization was allegedly a common occurrence, and his violations of the rules went unreported. Id. at 275. Davis' family filed suit against OAR, contending that it had a duty to exercise care in its supervision of Dudley. Id. The Supreme Court of Virginia agreed. The Court held that OAR had a custodial duty over Spencer, for purposes of § 319 of the Restatement (Second) of Torts, since Spencer was actively serving a sentence, and since OAR, through its contract with the Virginia Department of Corrections, undertook responsibility to continuously supervise him. Id. at 276. The Court also held that the plaintiff alleged sufficient facts to establish that OAR knew or should have known that Spencer was likely to cause bodily harm to others unless he was controlled. Id. at 277. Finally, the Court emphasized that OAR was not a public entity, and thus, that Marshall, in which the Court limited the duty owed by public entities and officials, was "inapposite." Id.

Based on the foregoing distinguishable facts, the court is unable to conclude that Dudley provides support for the plaintiff's claim for nonfeasance. As previously stated, the plaintiff's allegations establish that the RCPD did not take custody of or exercise control over Holmes. Additionally, the City of Roanoke is a public entity, and the plaintiff does not attempt to distinguish any duty owed to Connie Mills from any duty owed to the citizenry at large. Consequently, the City had no duty to control Holmes' conduct, and the plaintiff's claim for nonfeasance must be dismissed.

16

## Conclusion

For the reasons stated, the court will grant the defendants' motion to dismiss. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 12th day of October, 2007.

/s/ Jack Conrad
United States District Judge

17

Case 7:07-cv-00220-GEC   Document 17   Filed 10/12/07   Page 17 of 17   Pageid#: 106